825 A.2d 1008

**Marvin JENKINS**

v.

**STATE of Maryland.**

No. 107, Sept. Term, 2002.

Court of Appeals of Maryland.

June 12, 2003.

286

---

Sherrie B. Glasser, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for petitioner/cross–respondent.

Zoe Gillen White, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for respondent/cross–petitioner.

Argued Before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

CATHELL, Judge.

Marvin Jenkins, petitioner, seeks review of a judgment of the Maryland Court of Special Appeals affirming a trial judge's dismissal of petitioner's motion for a new trial. As relevant here, that motion had alleged, as grounds, an improper contact between a juror and a detective witness for respondent, the State of Maryland.

After various pre-trial motions were heard, petitioner was tried by a jury from March 19th to March 30th, 2001. Petitioner was convicted in the Circuit Court for Montgomery County on several counts stemming from an April 13, 2000 shooting. He was convicted of second degree murder of Steven Dorsey, Jr., use of a handgun in the commission of a crime of violence as a result of his actions in the shooting, and he was convicted of attempted first degree murder, attempted second degree murder and first degree assault on Michael Clark, a companion of Dorsey during the incident.[1] He was found not guilt of conspiracy to commit first degree murder.

The trial judge sentenced petitioner to the following: thirty years imprisonment for the second degree murder conviction in respect to the victim Dorsey; a consecutive term of ten years imprisonment for the use of a handgun in the commission of a crime of violence conviction; a consecutive term of twenty years for the conviction of attempted first degree murder and a concurrent twenty-year sentence for first degree assault of Clark.[2]

---

1. The trial court merged the conviction for attempted second degree murder of Clark into the conviction for attempted first degree murder of Clark.

2. On appeal, the Court of Special Appeals merged petitioner's twenty-year sentence for first degree assault into the sentence for attempted first degree murder pursuant to the rule of lenity. *Jenkins v. State,* 146 Md.App. 83, 135, 806 A.2d 682, 712 (2002). This issue was not raised on petition to this Court.

On April 9, 2001, petitioner filed a motion for a new trial pursuant to Md. Rule 4–331(a),[3] including, as one ground, that there had been improper contact between a State's witness and a juror during the trial causing prejudice to petitioner and thus precluding his right to a fair trial. It is only this issue that is before us. The evidentiary hearing on the motion for a new trial was held on April 19, 2001, and counsel's arguments on the same motion were heard on June 20, 2001. On July 13, 2001, the trial judge issued an order denying the motion for a new trial, finding that the State's witness' contact with a juror constituted improper conduct, but that the conduct, under the circumstances in this case, did not prejudice petitioner.

Petitioner filed an appeal to the Court of Special Appeals. On September 4, 2002, the Court of Special Appeals affirmed the trial court's ruling in denying the motion for a new trial. *Jenkins v. State*, 146 Md.App. 83, 806 A.2d 682 (2002). The Court of Special Appeals used an "abuse of discretion" standard to determine that, while the contact between the witness and the juror was improper, the trial court did not abuse its discretion in finding that the State properly rebutted any presumption of prejudice, if such a presumption even existed.[4] *Id.* at 116, 806 A.2d at 701.

Petitioner then filed a Petition for Writ of Certiorari to this Court. Along with an answer to that petition, the State filed a Conditional Cross–Petition, to which petitioner replied. The State subsequently submitted a reply brief to petitioner's reply to the State's Cross–Petition. On December 19, 2002,

---

3. Md. Rule 4–331(a), "Motions for new trial" states:

   "(a) **Within ten days of verdict.** On motion of the defendant filed within ten days after a verdict, the court, in the interest of justice, may order a new trial."

4. The Court of Special Appeals additionally held that a co-defendant's statement to the victim prior to the incident regarding the purchase of a gun was relevant non-hearsay, that the identification procedures used by the police were not improperly suggestive, that lenity required merger of the sentence for first degree assault to merge with the sentence for attempted first degree murder and that the evidence presented was sufficient to support a conviction. These issues, however, were not presented to this Court for review.

this Court granted both petitions. *Jenkins v. State*, 372 Md. 429, 813 A.2d 257 (2002). In his brief, petitioner presents one question for our review:

"Did the trial judge err in refusing to grant Petitioner's motion for a new trial after it was ascertained that one of the jurors engaged in *ex parte* communications with a crucial state's witness during the trial?"

Respondent presents this Court with two questions:

"1.  Did the Court of Special Appeals properly affirm the lower court's refusal to grant Jenkins's motion for new trial?

"2.  Has Supreme Court precedent eviscerated the holding of *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), that a presumption of prejudice arises when improper communication with a juror occurs?"

We hold that denial of petitioner's motion for a new trial was a clear abuse of discretion under the specific egregious circumstances in the case *sub judice*, where, during a recess in a criminal trial, both the juror and the State's detective witness clearly ignored the trial court's orders prohibiting interaction between jurors and witnesses, where the juror not only intentionally sought out interaction with the detective during a weekend religious retreat, but, after such retreat, went to lunch with the detective while the trial was still pending and where they discussed personal details of their lives,[5] and the State's detective witness drove the juror to his car in her own personal vehicle. Regardless of whether details of the ongoing trial were discussed, personal and prolonged contact as occurred in this case not only interjects an inherent prejudice to petitioner in the form of possible bias in favor of the State's case, but also creates an appearance of serious impropriety and causes subsequent serious harm to the perception of the integrity of the jury process itself.

---

5.  For the purpose of this opinion, discussion of personal details is meant to encompass information exchanged regarding close, personal details of one's life, including, but not limited to, family, work, ideals, and religion, discussed *infra*.

## I. Facts

### A. Background Facts

On April 13, 2000, Michael Clark, Stephen Dorsey, Jr. and several friends were spending the day smoking PCP and marijuana, when, after nearly six hours of using drugs, Clark briefly blacked out. Later, at approximately 8:40 p.m., the group went to the home of Sean Riley and continued to smoke PCP. Clark admitted to being under the influence of drugs to the extent that he needed assistance when walking after this session of using drugs. After leaving Riley's home with Dorsey, walking up the street and vomiting, Clark alleged that he became more sober. Clark testified that at approximately 11:15 p.m., two men, unknown to Clark at the time, approached him and Dorsey while they were walking near the corner of Spring and Douglas Streets in the Lincoln Park area of Montgomery County. One of the men, later identified as David Barnett, a co-defendant of petitioner, informed Dorsey that Barnett was looking for him. Dorsey responded by saying, "I still got that for you." Clark stated that the other man, the petitioner, walked to a parked car and Barnett pulled out a gun and started shooting. Clark fled.

After unsuccessfully attempting to find assistance, Clark returned to the scene of the shooting and saw Dorsey laying on the ground. The police soon arrived and Officer William Nierberding was unable to immediately procure information from the "emotionally upset" Clark. Clark, however, soon gave a brief description of the two assailants and was placed in the backseat of a police cruiser where Detective Patricia Pikulski interviewed him for approximately 45 minutes.[6]

---

**6.** It was Detective Pikulski who later had improper contact with a juror. Petitioner includes several additional facts, *i.e.*, facts allegedly challenging Clark's credibility and implicating another in the perpetration of the Dorsey shooting. These facts, however, are not directly relevant to the determinative issue raised in this appeal, whether the motion for new trial was properly denied in light of the State's witness' improper contact with a juror, and are thus omitted here.

Detective Pikulski testified that Clark was emotional and "somewhat evasive" with his responses to her questions. Clark told her that he and Dorsey were not walking together and that he could not hear the conversation between the two men who approached Dorsey. Detective Pikulski testified that Clark was coherent and did not appear to be under the influence of drugs. Later, however, Clark changed this story and testified that he did overhear the conversation and said that he lied to the police because he was afraid of the police due to the fact that he was high on drugs. Barnett and petitioner were tried separately for their actions related to this shooting.

### B. Witness/Juror Interaction

The Petition to this Court stems from an extensive non-incidental, improper contact between a juror and Detective Pikulski[7] during the weekend of March 23rd and 24th, 2001. Detective Pikulski was called as a State witness and testified in petitioner's trial on Wednesday, March 21, 2001. In addition to her testimony, the defense marked her notes, taken during her interview with Mr. Clark immediately after the shooting, as an exhibit and questioned her about them. On re-direct examination, those notes were read into the record as evidence. After she concluded her testimony, the trial court stated the following:

> "You may step down and ... you are subject to the subpoena but you may leave. There is a rule on witnesses so don't discuss your testimony with any other witness or permit any other witness to discuss their testimony with you. We will notify you if we need you at a future time."

On April 4, 2001, after the jury had issued their verdict in petitioner's case and after the trial court had accepted its verdict, Detective Pikulski had reason to be present in the State's Attorney's Office for a matter unrelated to petitioner. While there, Detective Pikulski saw the prosecutor in petition-

---

7. As indicated, Detective Pikulski was a State's witness who was the first detective to interview the State's key witness, Michael Clark. Detective Pikulski testified as to that interview at trial.

er's case and told her, during a casual conversation, that she had contact with Mr. McDonald,[8] a juror, at a religious retreat during the course of the trial. The State's attorney immediately contacted the court and defense counsel. The next day, six days after the jury convicting petitioner rendered its verdict and that verdict was accepted and the jury discharged, an emergency hearing took place. On April 19, 2001, the trial court heard testimony from Detective Pikulski and Juror McDonald.[9] They testified regarding the extensive contact they had during and immediately following a weekend religious retreat in Virginia that the two had attended while the proceedings against petitioner were in mid-trial.

Juror McDonald testified that he attended a small religious retreat, *i.e.*, 25–30 people were in attendance, from Friday evening, March 23, 2001, until Saturday afternoon, March 24, 2001. Juror McDonald said that on Friday evening he recognized Detective Pikulski from the trial and first attempted to avoid contact with her. Later, in violation of the court's order, he approached the Detective and said, "Look, you don't know who I am, but I'm a juror in a case that you testified in, and I can't have any dealings with you," [10] to which Pikulski later replied, "Oh, did you, you know, did you find him guilty?" Mr.

---

**8.** In the trial transcript, this juror's name was spelled in different ways. The "McDonald" spelling was used by the parties in this proceeding.

**9.** At the hearing on the Motion for a New Trial, the testimony of Juror McDonald was subject to the limitations of Maryland Rule 5–606, which provides that after a verdict has been rendered and accepted and the jury discharged, jurors are prohibited from giving certain testimony pertaining to jury deliberations and the influencing effect of anything on the juror's ability to deliberate and on a juror's mental processes during deliberations. *See infra.*

**10.** After the jury was selected, but before it was sworn, the trial judge stated the following to the jury before a lunch recess (the record does not reflect whether Detective Pikulski was in the courtroom at this time):

"I want to do everything I can to keep you apart from any persons who might be testifying as witnesses in this case, and since they tend to congregate right outside, I want to put some physical distance between the two of you so that you [do] not overhear anything perhaps that you should not hear.

McDonald testified that he thought this comment to mean that Detective Pikulski thought that he was a juror from a different, completed trial and that he then told her that the trial remained in progress.

> "Which [leads] to my next thing: When you return, and actually is part of the instructions I will give to you at the end of the case, you are going to be advised that you must decide this case based only upon the information that comes to you here in this courtroom and nothing else.
>
> "So, therefore, you must do everything reasonable within your power to avoid contact with any of the witnesses, parties, or persons you see in close contact with them outside of the courtroom.
>
> "Don't let anybody speak to you about this case, and don't speak to anyone about it yourself. Don't even speak among each other about this case.
>
> "So I'm going to excuse you with that admonition. Do everything that you can reasonably and possibly do to make sure that nobody says anything to you about this case outside of the information that's going to come to you about it inside the courtroom." [Alterations added.]

Later, after the lunch recess, the trial court again informally instructed the jury, in part, with the following:

> "[A]ny time we do take the recess, please leave the courtroom. Do not take them in the jury room, and please assemble at the far end of this hall away from any potential witnesses or persons who might be in contact with any of the parties."

Later that day, and prior to the weekend recess relevant here, the court instructed the jury with pattern instructions, including the following:

> "Please do not allow yourself to overhear anyone discussing the case. Do not have *any* contact outside the courtroom with any of the parties, *witnesses*, or lawyers.
>
> . . .
>
> "*If anything does occur, contrary to these instructions, please write a note as soon as possible.* Do not discuss it with any other member of the jury, and give it to my law clerk ... and he will bring it to my attention.
>
> "Again, upon any recess, as I mentioned, do not discuss the case with anyone or let anyone discuss the case with you or in your presence. This would include other jurors, courtroom personnel, friends, and relatives, spectators, and/or reporters.
>
> "In addition, *please avoid any contact* with the parties, lawyers, and witnesses involved in this case.
>
> "If anyone tries to discuss the case with you or if anything questionable occurs, again, please write a note as soon as possible. Do not discuss it with any other juror." [Emphasis added.]

At the hearing on the motion for new trial, Mr. McDonald was not asked questions regarding why he did not bring this contact/communication with Detective Pikulski to the attention of the court during the trial, as he was instructed to do.

Mr. McDonald said that the two did not discuss the matter further, although in further violation of the court's order they continued the contact, discussing only general, non-trial, topics. The following day, he stated that the two, *unintentionally*,[11] sat next to each other during the seminar. After the early completion of the seminar, the two, at McDonald's invitation, went to lunch together where they were alone for most of the meal.[12] According to them, their conversation over lunch focused on Mr. McDonald's employment in environmental matters and Pikulski's son's schooling in chemistry and interest in the environment. Following their lunch, Mr. McDonald testified that Detective Pikulski offered to give him a ride to his car, which was being repaired at a dealership approximately one-half of a mile away. He stated that after the Detective took him to his car, the two had no more contact.

Detective Pikulski's account of her interaction with Mr. McDonald was similar. She testified that she arrived at the religious retreat in Virginia at approximately 6:50 p.m. on Friday evening, March 23, 2001. She stated that within a short period of time after her arrival she engaged in a conversation with Mr. McDonald. After several minutes, Mr. McDonald walked away only to return to state that he was "on the jury." Detective Pikulski stated that she replied with something similar to "Oh, you're one of the ones that convicted him?" She said that McDonald replied by saying, "I can't talk about it." Detective Pikulski then inquired whether Mr. McDonald was on a current active jury, to which he replied in the affirmative. She then stated, "You're right. We can't talk about this." She stated that the seminar ended around 9:30 that evening.

---

11. At the April 19, 2001 hearing, McDonald stated, "And when we rearranged the chairs and everything it turned out, just by-that she [Pikulski] ended up being the person next to me" (alteration added). There was no evidence presented that either of them made any attempt to separate from each other. They permitted the contact to continue.

12. A friend of Mr. McDonald's joined them for a brief period of time.

At 9:00 a.m. the following morning, the seminar resumed and concluded at approximately 1:30 p.m., earlier than expected. According to Detective Pikulski, she briefly talked to Mr. McDonald, who invited her to eat lunch with him. She agreed and the two ate lunch at a nearby restaurant for approximately an hour and a half, where each paid for their own meals. Detective Pikulski testified that the topic of conversation included the sharing of personal information about each other and their families. She also learned that Mr. McDonald volunteered at a soup kitchen where she attends Sunday school. After lunch, Detective Pikulski said that she gave Mr. McDonald a ride to his car, which she said was about two miles away.

On Monday, March 26, 2001, while the trial was ongoing, Detective Pikulski informed another detective, Detective Penrod, about her contact with Mr. McDonald, yet neither Juror McDonald, Detective Penrod or Detective Pikulski brought the matter to the attention of the court at that time.

## II. Discussion

### A. Standard of Review

This Court has very recently discussed the standard of review of a trial judge's denial of a motion for a new trial in the case of *Campbell v. State,* 373 Md. 637, 821 A.2d 1 (2003). In *Campbell,* in the context of a motion for a new trial based on new evidence, we stated:

> "[D]enials of motions for new trials are reviewable on appeal and rulings on such motions are subject to reversal when there is an abuse of discretion. *Mack v. State,* 300 Md. 583, 600, 479 A.2d 1344, 1352 (1984); *Wernsing v. Gen. Motors Corp.,* 298 Md. 406, 420, 470 A.2d 802, 809 (1984). We have noted that the discretion afforded a trial judge 'is broad but it is not boundless.' *Nelson v. State,* 315 Md. 62, 70, 553 A.2d 667, 671 (1989). The abuse of discretion standard requires a trial judge to use his or her discretion soundly and the record must reflect the exercise of that discretion. Abuse occurs when a trial judge exercises discretion in an

arbitrary or capricious manner or when he or she acts beyond the letter or reason of the law. *Ricks v. State*, 312 Md. 11, 31, 537 A.2d 612 (1988).... In the context of the denial of a motion for a new trial in a criminal case, we have noted that 'under some circumstances a trial judge's discretion to deny a motion for a new trial is much more limited than under other circumstances.' *Merritt v. State*, 367 Md. 17, 29, 785 A.2d 756, 764 (2001). We stated,

> 'it may be said that the breadth of a trial judge's discretion to grant or deny a new trial is not fixed or immutable; rather, it will expand or contract depending upon the nature of the factors being considered, and the extent to which the exercise of that discretion depends upon the opportunity the trial judge had to feel the pulse of the trial and to rely on his own impressions in determining questions of fairness and justice.'

*Wernsing*, 298 Md. at 420, 470 A.2d at 802."

*Id.* at 665–66, 821 A.2d at 18.

Petitioner argues that the Court of Special Appeals erred in failing to reverse the trial court's order denying his motion for a new trial because that court utilized the abuse of discretion, rather than a harmless error, standard of review.[13] Petitioner relies on the recent case of *Merritt v. State*, 367 Md. 17, 785 A.2d 756 (2001), a case where this Court applied a harmless error standard of review where a court clerk erroneously submitted documents to the jury that had not been admitted into evidence. The State agrees that *Merritt* applies, but it proffers a narrower interpretation of *Merritt* under the facts in the case *sub judice*, which would require the use of an abuse of discretion, not harmless error, standard.

---

**13.** In their briefs to the intermediate appellate court, both parties maintained that the proper standard of review under *Merritt* is harmless error. On appeal to this Court, the State proffers that *Merritt* requires an abuse of discretion standard, while petitioner continues to maintain that the harmless error standard is proper. The Court of Special Appeals used the abuse of discretion standard.

In *Merritt,* Judge Eldridge, writing for this Court, discussed in great detail the history of this Court's cases that have reviewed a trial court's denial of a motion for a new trial. *Id.* at 24–31, 785 A.2d at 760–65. The defendant in *Merritt* was convicted of several offenses related to a murder. Two days after the verdict, the State learned that a defense exhibit, which had been marked for identification but had not been admitted into evidence, was mistakenly submitted to the jury during the deliberative stage by the court clerk. The defendant moved for a new trial, which was denied by the trial judge. Petitioner relies on the following language of *Merritt,* where the Court ultimately held, in reference to the proper standard of review in that case, that:

> "some denials of new trial motions are reviewable under a standard of whether the court erred rather than under an abuse of discretion standard. Accordingly, when an alleged error is committed during the trial, when the losing party or that party's counsel, without fault, does not discover the alleged error during the trial, and when the issue is then raised by a motion for a new trial, we have reviewed the denial of the new trial motion under a standard of whether the denial was erroneous. Also, in these criminal cases where we concluded that error did occur, the matter of prejudice was reviewed under the harmless error standard of *Dorsey v. State,* 276 Md. 638, 350 A.2d 665 (1976)."

*Id.* at 30–31, 785 A.2d at 764–65 (some citations omitted). Petitioner argues, since the errors in the both the case *sub judice* and in *Merritt* occurred at trial, were not the fault of the parties and were not discovered until after the return of the jury's verdict, that this case falls under the same harmless error standard used in *Merritt.*

The State, however, proffered that there is a crucial distinction between *Merritt* and the present case. As the State points out, had the clerk's error in *Merritt* been discovered while the trial was still in progress and the defense objected and the trial court nevertheless allowed the inadmissible defense exhibit to go to the jury at the close of the evidentiary stage, the court's ruling, under those circumstances, would be

reviewed under a harmless error standard, not an abuse of discretion standard. We stated in *Merritt:*

"[The defense exhibit] was submitted to the jury as if it had been admitted into evidence. The substance and result of the clerk's action was essentially the same as the action of a trial judge in erroneously admitting an exhibit into evidence. The only real difference would be that, in the latter situation, defense counsel would have been aware of the action and would have had an opportunity to object."

*Id.* at 32, 785 A.2d at 765 (alteration added). The State argues that we reviewed *Merritt,* therefore, under the same error standard that would have been utilized if the inadmissible evidence had been admitted during the trial. The State's position appears to be that, in *Merritt,* we did not use the stricter standard of review generally used for review of motions for new trials, the abuse of discretion standard, only because the failure to preserve the issue was due to no fault of the defense and the lower standard would have been used if the error occurred during the trial itself. Accordingly, it appears to be the State's position that the rule to be deduced from *Merritt* is that the standard of review used, in cases where the error occurs during the course of the trial but, not due to any fault of the moving party, and is not discovered until after a verdict is rendered, is the same standard under which the error would have been reviewed if it had been discovered during the trial.

The problem in this case, unlike *Merritt,* does not involve an error in respect to the admissibility of evidence. It involves the matter of whether a juror was improperly influenced by improper contacts and whether, if so, that juror improperly influenced other jurors. And finally, the present situation concerns whether the trial court had lost the power to make sufficient inquiry once the verdict had been rendered and accepted and the jury excused. Moreover, in this case there is no issue of evidence admissibility. If the juror/witness misconduct and been discovered during the trial, petitioner could have either moved to remove the juror and replace him with an alternate juror or moved for a mistrial. The trial

court's decision involving either of these courses of action under those circumstances would have been reviewed under an abuse of discretion standard. *See Ware v. State,* 360 Md. 650, 666, 759 A.2d 764, 772 (2000)(criminal defendants are entitled to a fair and impartial jury under the United States Constitution and Maryland law and any decision to exclude a juror for cause is left to the discretion of the trial judge, and thus will not be disturbed unless an abuse of discretion occurred). Thus, the standards of review in *Merritt* and in this case are different.[14] We will review the trial judge's denial of petitioner's motion for a new trial in the case *sub judice* under an abuse of discretion standard.

## B. Juror Misconduct

A criminal defendant's right to have an impartial jury trial is one of the most fundamental rights under both the United States Constitution and the Maryland Declaration of Rights. Inherent in both documents are the paramount notions of justice and fair process during criminal proceedings. Specifically, the Sixth and Fourteenth Amendments to the United States Constitution and Article 21 of the Maryland Declaration of Rights require impartiality and fairness. The Sixth Amendment states:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, *by an impartial jury* of the State and district wherein the crime shall have been committed; which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defence." [Emphasis added.]

Article 21 of the Maryland Declaration of Rights similarly states:

---

14. The result would be the same under either standard.

**"Rights of accused; indictment; counsel; confrontation; speedy trial; impartial and unanimous jury.**

"That in all criminal prosecutions, every man hath a right to be informed of the accusation against him; to have a copy of the Indictment, or charge, in due time (if required) to prepare for his defence; to be allowed counsel; to be confronted with the witnesses against him; to have process for his witnesses; to examine the witnesses for and against him on oath; and to a speedy trial *by an impartial jury,* without whose unanimous consent he ought not to be found guilty." [Emphasis added.]

Additionally, this Court has acknowledged that the Fourteenth Amendment to the United States Constitution[15] is an important tool in ensuring the impartiality of juries. In *Couser v. State,* 282 Md. 125, 138, 383 A.2d 389, 396–97 (1978), we said:

"It is true, of course, that the due process clause of the fourteenth amendment and Article 21 of the Maryland Declaration of Rights guarantee the right to an impartial jury to an accused in a criminal case; these constitutional guarantees do not, however, insure that a prospective juror will be free of all preconceived notions relating to guilt or innocence, only that [the juror] can lay aside his impressions or opinions and render a verdict based solely on the evidence presented in the case. *See Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); *Newton v. State,* 147 Md. 71, 127 A. 123 (1924); *Garlitz v. State,* 71 Md. 293, 18 A. 39 (1889)." [Alteration added.]

*See also Ware,* 360 Md. at 670, 759 A.2d at 774. In summary, we have long recognized that these provisions of the United States Constitution and the Maryland Declaration of Rights guarantee that a criminal defendant requesting a trial by jury will be tried fairly by an *impartial* jury. *See Evans v. State,* 333 Md. 660, 668, 637 A.2d 117, 121 (1994); *see also Turner v. Louisiana,* 379 U.S. 466, 471–72, 85 S.Ct. 546, 549, 13 L.Ed.2d

---

**15.** The Fourteenth Amendment to the United States Constitution, in relevant part, states, "No State shall ... deprive any person of life, liberty, or property, without due process of law...."

424, 428 (1965); *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751, 755 (1961) (in a case that overturned a state conviction where the process was corrupted by extensive press coverage, the Supreme Court stated, "the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process").

It has long been held that, in a jury trial, private, intentional communications and/or contacts between jurors and witnesses are generally improper, and convictions in such cases are subject to reversal unless the contacts are proven to be nonprejudicial to the defendant. *See Mattox v. United States,* 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892). Such contacts raise fundamental concerns on whether the jury would reach their verdict based solely upon the evidence presented at trial or whether it would be improperly influenced by the inappropriate contacts. *See Turner,* 379 U.S. at 472, 85 S.Ct. at 549, 13 L.Ed.2d at 429 (stating, "The requirement that a jury's verdict 'must be based upon the evidence developed at the trial' goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury")(referencing *Sinclair v. United States,* 279 U.S. 749, 765, 49 S.Ct. 471, 476, 73 L.Ed. 938, 946 (1929)); *see also Patterson v. Colorado,* 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879 (1907)("The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print").

Once misconduct or improper contact is found, the United States Supreme Court has even recognized that some such juror contacts with third parties and/or misconduct can reach a level of being presumptively prejudicial to a defendant, thus placing the burden of showing harmlessness on the State. In *Remmer v. United States,* 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654, 656 (1954), the Supreme Court stated:

*"In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a*

*trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial,* if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant. *Mattox v. United States,* 146 U.S. 140, 148–150, 13 S.Ct. 50, 52–53, 36 L.Ed. 917; *Wheaton v. United States,* 8 Cir., 133 F.2d 522, 527.

" . . . A juror must feel free to exercise his functions without the F.B.I. or anyone else looking over his shoulder. The integrity of jury proceedings must not be jeopardized by unauthorized invasions. The trial court should not decide and take final action *ex parte* on information such as was received in this case, but should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." [Emphasis added.]

In that case, a juror was contacted by an unknown person suggesting that the juror could profit in finding a verdict in favor of the petitioner in that case. The juror immediately reported the incident to the court *during the trial itself* and the court, without the defendant's knowledge of the incident, held an *ex parte* hearing. Additionally, the Federal Bureau of Investigation launched an investigation into the incident and subjected the jurors to the investigation during the trial. The Supreme Court ultimately held that the situation was presumptively prejudicial and that a hearing in which all the parties were allowed to participate should take place on remand.

While this Court has not had occasion to interpret the *Remmer* presumption of prejudice, the Court of Special Appeals has applied it in the case of *Eades v. State,* 75 Md.App. 411, 541 A.2d 1001 (1988), and *Allen v. State,* 89 Md.App. 25, 597 A.2d 489 (1991), both of which were decided after *Smith*

but before *Olano*.[16]   In *Eades*, during a weekend recess, a juror violated the court's instruction not to discuss the case with third persons when she asked *her husband* (not a witness), who was an Assistant United States Attorney for the District of Columbia, an evidentiary question.   After the verdict had been initially rendered but before it had been accepted in *Eades*, the defendant requested that the trial court poll the jury and ask each juror, individually and out the presence of the other jurors, whether, over the weekend recess, the juror had discussed the facts or substance of the case with anyone.   At this point the court retained the power to not accept the verdict and direct the jury to continue deliberations.   The trial court's questioning of juror Skinner, the juror whose conduct was in question in *Eades*, went as follows:

"MRS. SKINNER: No, I did not.   At one point I asked my husband [an Assistant United States Attorney for the District of Columbia] whether a statement—because you kept saying—why she could say-it was okay for her to say it, 'I knew I had been caught,' and my husband said that was a spontaneous utterance.

THE COURT: Okay.

MS. SKINNER:—hearsay.

MR. MONOHAN (Defense Counsel): I do not know if the Court wants me to ask the juror any questions.

THE COURT: No. All right.   Thank you, ma'am.   Other than that one statement, nothing substantively about the facts or how the jury was standing?

MS. SKINNER: No." [Footnote omitted.]

*Eades*, 75 Md.App. at 415, 541 A.2d at 1003–04 (alteration added).   After the completion of the individual questioning of each juror, the trial court harkened them to their verdict and

---

16.   The State asserts that the cases of *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982), and *United States v. Olano*, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), have eroded or eliminated this presumption.   For reasons stated *infra*, we do not agree; any limitation, if it exists, would not bar such a presumption in the circumstances in the case *sub judice*.

the jurors all agreed that the verdict was correct. The trial court denied the defendant's motion for a new trial, reasoning that Juror Skinner's question "was all but innocuous." *Id.* at 416, 541 A.2d at 1004.

In discussing whether the *Remmer* presumption of prejudice standard applied in Maryland, Judge Karwacki, writing for the Court of Special Appeals, stated:

"Maryland appellate courts have not had occasion to decide the legal standards for evaluating the effect of an improper communication between a juror and a person who is unrelated to the judicial proceeding.[17] The standards that have been applied to improper communications between the trial judge and the jury, made outside the defendant's presence, are instructive. Where the record affirmatively shows that a criminal defendant was prejudiced by the improper communications by the trial judge with the jury, that error requires reversal of the conviction. *La Guardia v. State,* 190 Md. 450, 458, 58 A.2d 913 (1948).[18] *Also, if the record discloses an improper communication but does not show whether the error prejudiced the defen-*

---

**17.** The person here with which Juror McDonald had improper contact, a detective witness for the prosecution, *was* related to the proceeding.

**18.** In *La Guardia v. State,* 190 Md. 450, 458–59, 58 A.2d 913, 917 (1948), in holding that the record affirmatively showed that the judge's communication to the jury did not have any tendency to influence the jury's verdict, this Court stated:

"In the Court below the jury were instructed before they retired for their deliberations that they had the right in their discretion to make any recommendation of mercy which they desired to make if they found the defendants guilty on any of the counts of the indictment. During their deliberations they sent a message to the court inquiring whether less than twelve jurors could recommend mercy for one of the defendants. The judge sent them a reply that less than twelve could recommend mercy. Less than a majority did recommend mercy for the defendant who has not appealed. No juror made any recommendation concerning either of appellants. *The record shows definitely what the judge's communication was.* The communication could not have caused appellants any prejudice. It had no direct relation to the verdict whatever and no possible indirect constraining relation." [Emphasis added.]

*dant, prejudice will be presumed requiring reversal.*[19]  *Id.*
at 458, 58 A.2d 913.   But when the record affirmatively
shows that a judge's improper communication with the jury
out of the presence of the defendant was not prejudicial or
had no tendency to influence the verdict of the jury, rever-
sal is not required.   *Id.* at 458, 58 A.2d 913; *see also
Midgett v. State,* 216 Md. 26, 36–37, 139 A.2d 209 (1958);
*Smith v. State,* 66 Md.App. 603, 624, 505 A.2d 564, *cert.
denied,* 306 Md. 371, 509 A.2d 134 (1986);  *Campbell v. State,*
12 Md.App. 637, 641, 280 A.2d 292 (1971);  *Winegan v. State,*
10 Md.App. 196, 203, 268 A.2d 585 (1970). . . .

"In *Hitchcock v. State,* 213 Md. 273, 285, 131 A.2d 714
(1957), the Court of Appeals held that a trial court did not
abuse its discretion in denying the defendant's motion for a
new trial, which was based on the affidavit of a spectator at
the trial who had observed two members of the jury en-
gaged in a discussion with the prosecutor during a recess.
The Court did not presume that this discussion was prejudi-
cial, but instead affirmed the trial court that the conversa-
tion was [not] in any way connected with the case.   *Id.* at
285, 131 A.2d 714.   But in *Oliver v. State,* 25 Md.App. 647,
650, 334 A.2d 572 (1975), we held that an improper commu-
nication between a bailiff and deliberating jurors gave rise
to a 'spectre of prejudice.'

"*We will assume that the Supreme Court's holding in
Remmer as to the presumptively prejudicial effect of any*

---

**19.**  This is even more apparent in the record here, as Md. Rule 5–606
makes it almost impossible to show whether there was prejudice
because after a jury verdict is accepted, the trial court cannot inquire as
to a juror's motives during deliberations.   *See* Md. Rule 5–606, dis-
cussed *infra.*   It would, for the same reason, be very difficult for the
State to rebut any presumption of prejudice under such circumstances.
The Court of Special Appeals in *Eades,* citing 8 Wigmore, *Evidence,*
§ 2350 (McNaughton rev.1961), made a distinction between prior Ma-
ryland cases because in *Eades* the information about the contact was
disclosed during the polling of the jury, at a point when the jury had not
been discharged and could still have been directed to return to deliber-
ate further.   *See Eades,* 75 Md.App. at 419, 541 A.2d at 1005–06.   In
the case at bar the jury had been discharged before the matter was
brought to the court's attention.

*private communication with a juror concerning a matter pending before the jury remains the law.* Nevertheless, we hold that the trial court in the case *sub judice* did not abuse its discretion in denying appellant's motion for a new trial, because the inquiry of the trial court and the juror's response thereto effectively overcame the presumption operating in appellant's favor."

*Eades*, 75 Md.App. at 422–24, 541 A.2d at 1007–08 (emphasis added)(alteration added). In holding that the presumption of prejudice had been rebutted, the court cited the relatively brief discussion that the juror had with her husband, her responses to the trial court's questioning, that the conversation was not "inherently suspect" and the fact that the improper contact merely dealt with an evidentiary problem unrelated to the question of guilt. The court concluded by stating, "Because the presumption that the improper juror communication was prejudicial was effectively overcome, appellant was not deprived of a fair trial. We therefore hold that the court did not abuse its discretion in denying appellant's motion for a new trial." *Id.* at 425, 541 A.2d at 1008. It is important to note that the juror's husband in *Eades* did not have any interest in the outcome of that case. He was a prosecutor in another jurisdiction. In the case *sub judice,* the juror was in extensive contact with a prosecution witness still subject to recall in the middle of the trial. In *Eades,* the trial court still had the power to act to mitigate any impropriety prior to accepting the verdict. In the present case it did not.

In *Allen,* after the jurors retired to consider the evidence, a co-defendant ate breakfast with a dismissed alternate juror and implicated himself and cleared his brother of some of the charges against him. The alternate juror, in turn, relayed this information to a sitting juror during a recess in the jury's deliberations. Upon recommencement of deliberations, the sitting juror immediately informed the foreperson of the incident, who promptly reported it to the trial court. After conducting a *voir dire* of the affected jurors, the trial court denied the defendants' motion for mistrial. After finding that the co-defendant deliberately acted in a manner to cause the

jury taint, which, in and of itself may have been cause to dismiss the motion, the intermediate appellate court held:

" 'It is well established in Maryland that in determining whether jury contact is prejudicial, a trial court must balance the 'probability of prejudice from the face of the extraneous matter in relation to the circumstances of the particular case.' *Harford Sands, Inc. v. Groft*, 320 Md. 136, 138–39, 577 A.2d 7 (1990) (quoting *Wernsing v. General Motors Corp.*, 298 Md. 406, 411, 470 A.2d 802 (1984)). Where the record affirmatively shows prejudice by improper communications, the error requires reversal; but where the record affirmatively shows no prejudice, reversal is not required. *See Eades v. State*, 75 Md.App. 411, 422–23, 541 A.2d 1001, *cert. denied*, 313 Md. 611, 547 A.2d 188 (1988). *See also Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982) (due process does not require a new trial every time a juror has been placed in a potentially compromising situation). *If the record does not show whether the error prejudiced the defendant, prejudice is presumed, and the burden falls on the state to rebut the presumption of harm. Id.; see Remmer v. United States,* 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954). The decision as to whether the State has met this burden is committed to the trial court's discretion and, like other motions for mistrial or new trial, will be reversed only upon a finding of abuse of that discretion. *Harford Sands*, 320 Md. at 146, 577 A.2d 7. *See also Joseph F. Hughes & Co., Inc. v. Stockhausen*, 212 Md. 559, 563, 129 A.2d 844 (1957) (question as to whether contact with jurors requires a new trial is 'left to the sound discretion of the trial court, whose decision will only be disturbed in those cases where there has been a plain abuse of discretion, resulting in palpable prejudice').

"*Here, the affected jurors made absolutely no attempt to hide the extraneous information.* Rather, they promptly and discreetly reported it to the trial judge. The judge then conducted a thorough and careful *voir dire* on the issue. He asked both jurors if the extrinsic information 'in

any way affected (their) deliberations' and if they could still be 'fair and impartial.' Both jurors stated that their deliberations would not be affected by the extrinsic evidence and that they could remain fair and impartial. Both also testified that no other jurors had learned of the extrinsic information. Because the trial judge 'has a unique opportunity to observe the jurors during trial,' *Dickson v. Sullivan*, 849 F.2d 403, 405 (9th Cir.1988), we are unwilling to second guess the trial judge's conclusion that the jurors in this case could legitimately continue their deliberations. Accordingly, we hold here, as we did in *Eades v. State*, 75 Md.App. at 423–24, 541 A.2d 1001, that the trial judge did not abuse his discretion in denying the motions for mistrial because the judge's inquiry and the jurors' responses thereto effectively overcame the presumption that the jury's deliberations would be prejudiced by the extrinsic evidence."

*Allen*, 89 Md.App. at 46–48, 597 A.2d at 499–500 (footnotes omitted)(emphasis added). The court applied the *Remmer* presumption, but at the relevant point below the trial court still had the power and opportunity to protect the impartiality of the jurors. The Court of Special Appeals subsequently found that the State had rebutted that presumption due, in significant part, to the facts that, unlike the case at bar, the jurors committed no misconduct, *i.e.*, they did not affirmatively disobey the trial court's order, the two jurors immediately reported the incident before the jury reached a verdict and the trial court was able to conduct a thorough *voir dire* of the affected jurors (in which both jurors indicated that the improper contact would not affect the future impartiality of their deliberations) prior to the rendering of the verdict. Perhaps even more important, the incidents were brought to the trial court's attention while it still had the power to assure itself that the two jurors could continue fair and impartial deliberations. In the present case, the verdict was in and Maryland Rule 5–606 [20] prohibited inquiry into the verdict or into the respective jurors' motives or impartiality. There simply is no

---

**20.** *See infra.*

way in a specific case for the trial court in that case to meaningfully investigate the matter of juror motives and impartiality during jury deliberations after the verdict is in and accepted. Had the contacts in the case *sub judice*, like the contact in *Allen*, been brought to the trial court's attention prior to verdict, the trial court might have been able to determine whether the jurors would be able to continue to be impartial. Once a verdict is rendered, however, the focus changes from whether a juror could be impartial in the future to whether a juror has been impartial in the past. To overcome the presumption of prejudice when the verdict has already been rendered and the court lacks the power to inquire as to individual jurors' participation in deliberations, is much more difficult given the constraints on attacking the sanctity of jury deliberations and verdicts.

There were three alternate jurors chosen at the outset of the case *sub judice*. At the time this case went to the jury, on March 28, 2001, the alternate jurors were available to potentially replace Juror McDonald. All original 12 jury members partook in the entire trial and were available to commence deliberations, thus all the alternates were excused on March 28, 2001.

The State contends in its Cross–Petition that the *Remmer* presumption of prejudice, and any subsequent reliance on it by the Court of Appeals, has been eroded by the Supreme Court's subsequent cases of *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982), and *United States v. Olano*, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).[21] In *Smith*, the Supreme Court reversed a lower court's finding of a presumption of prejudice where a juror had applied to work in the office of the prosecutor during the trial. After the verdict had been rendered and accepted, during the state

---

**21.** The Court of Special Appeals did not decide whether the *Remmer* presumption remains valid in light of *Smith* and *Olano*, as it held that the State rebutted any presumption of prejudice, if one existed. *Jenkins*, 146 Md.App. at 110, 806 A.2d at 697–98.

hearing in the criminal case concerning the alleged improper juror misconduct, the following facts, *inter alia*, were elicited:

"After being selected and sworn as a juror on September 23, Mr. Smith lunched with Criminal Court Officer Rudolph Fontaine, who had attended the John Jay College of Criminal Justice with Mr. Smith's wife. They discussed jobs in law enforcement. Mr. Fontaine told Mr. Smith of opportunities for persons with investigative backgrounds in the District Attorney's office. Mr. Smith evinced interest."

*People v. Phillips,* 87 Misc.2d 613, 617, 384 N.Y.S.2d 906, 909 (1975). Although Mr. Fontaine was not involved in the trial proceedings for which Juror Smith was a sitting juror, this conversation led to Smith sending his employment application to the District Attorney's Office, the prosecution's office, during the course of the trial. Mr. Smith's action in sending an application for employment to the District Attorney's Office during the trial was the alleged misconduct in *Smith.*

The Supreme Court, in *Smith,* held that it was improper to presume prejudice in that situation, as the pre-trial *voir dire* and the post-trial hearing were sufficient to protect the defendant's rights. The Court said:

"These cases demonstrate that due process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. The safeguards of juror impartiality, such as *voir dire* and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. Such determinations may properly be made at a hearing like that ordered in *Remmer* and held in this case."

*Smith,* 455 U.S. at 217, 102 S.Ct. at 946, 71 L.Ed.2d at 86. Although *Smith* stands for the proposition that, in certain

cases, it is improper to impute prejudice where procedures have taken place to protect the defendant's rights, it does not stand for the proposition that it is improper to presume prejudice in *all* cases.

The relevant facts in *Smith* indicate that the juror in question was extensively questioned about his intentions of pursuing a career in law enforcement during the pre-trial *voir dire*. In fact, he admitted to this career track, to applying to a federal drug enforcement agency, to his wife's interest in law enforcement, to his wife's being previously assaulted, to his working as a store detective and to his familiarity with contacts at the prosecutor's office. Even after these admissions, he testified that he could be a fair and impartial juror and the defendant chose not to strike him from the jury. *Id.* at 213 n. 4, 102 S.Ct. at 944 n. 4, 71 L.Ed.2d at 84 n. 4. Even then, Justice O'Connor, in her concurring opinion in the 6–3 decision in *Smith*, vigorously expressed her view that a presumption of prejudice still exists for certain, egregious cases. Justice O'Connor stated:

> "*I concur in the Court's opinion, but write separately to express my view that the opinion does not foreclose the use of 'implied bias' in appropriate circumstances.*

## I

> "Determining whether a juror is biased or has prejudged a case is difficult, partly because the juror may have an interest in concealing his own bias and partly because the juror may be unaware of it. The problem may be compounded when a charge of bias arises from juror misconduct, and not simply from attempts of third parties to influence a juror.

> "Nevertheless, I believe that in most instances a postconviction hearing will be adequate to determine whether a juror is biased. A hearing permits counsel to probe the juror's memory, his reasons for acting as he did, and his understanding of the consequences of his actions. A hearing also permits the trial judge to observe the juror's

demeanor under cross-examination and to evaluate his answers in light of the particular circumstances of the case.

"I am concerned, however, that in certain instances a hearing may be inadequate for uncovering a juror's biases, leaving serious question whether the trial court had subjected the defendant to manifestly unjust procedures resulting in a miscarriage of justice. *While each case must turn on its own facts, there are some extreme situations that would justify a finding of implied bias.* Some examples might include a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction. Whether or not the state proceedings result in a finding of 'no bias,' the Sixth Amendment right to an impartial jury should not allow a verdict to stand under such circumstances.

"None of our previous cases preclude the use of the conclusive presumption of implied bias in appropriate circumstances. *Remmer*, ... on which the Court heavily relies, involved not juror misconduct, but the misconduct of a third party who attempted to bribe a juror. Under those circumstances, *where the juror has not been accused of misconduct or has no actual stake in the outcome of the trial, and thus has no significant incentive to shield his biases,* a postconviction hearing could adequately determine whether or not the juror was biased."

*Id.* at 221–23, 102 S.Ct. at 948–49, 71 L.Ed.2d at 89–90 (emphasis added)(footnote omitted).

Justice Marshall, joined by Justices Brennan and Stevens, dissenting, noted:

"Not only is the probability of bias high, it is also unlikely that a post-trial evidentiary hearing would reveal this bias. As the Court of Appeals stated, given the human propensity for self-justification, it is very difficult 'to learn from a juror's own testimony after the verdict whether he was in fact "impartial." ' Certainly, a juror is unlikely to admit

that he had consciously plotted against the defendant during the course of the trial. Such an admission would have subjected juror Smith to criminal sanctions."

*Id.* at 230, 102 S.Ct. at 953, 71 L.Ed.2d at 94–95 (citation omitted).

We agree with Justice O'Connor that *Smith* was not a case of such egregiousness that a presumption of prejudice necessarily followed in light of the extensive *voir dire* and post-trial hearings afforded the defendant in that case. Moreover, the record in *Smith* does not indicate that the trial judge in that case was subject to restraints similar to those imposed on Maryland judges by Maryland Rule 5–606 when a jury verdict has been accepted.

Later, in *Olano,* the Supreme Court overturned a Ninth Circuit Court of Appeals decision finding presumed prejudice in a criminal trial resulting in the grant of a new trial when an alternate juror was allowed to remain in the jury deliberation room while the jury reached a verdict. While the State claims that *Olano* precludes all presumptions of prejudice,[22] the *Olano* Court, itself, rejected such a broad preclusion. That Court stated:

"There may be cases where an intrusion should be presumed prejudicial, see, *e.g., Patton[ v. Yount], supra,* at 467 U.S., [1025] at 1031–1035, 104 S.Ct., [2885] at 2888–2890[, 81 L.Ed.2d 847 (1984) ]; *Turner v. Louisiana,* 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965), but a presumption of prejudice as opposed to a specific analysis does not change the ultimate inquiry: Did the intrusion affect the jury's deliberations and thereby its verdict? We cannot imagine why egregious comments by a bailiff to a juror *(Parker* [*v. Gladden,* 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966) ] ) or an apparent bribe followed by an official investigation *(Remmer)* should be evaluated in terms of 'preju-

---

**22.** The State specifically contends, in reference to *Smith* and *Olano,* "applying this most recent precedent from the Supreme Court, no presumption of prejudice should arise automatically from improper jury contact."

dice,' while the mere *presence* of alternate jurors during jury deliberations should not. Of course, the issue here is whether the alternates' presence sufficed to establish remedial authority under Rule 52(b), not whether it violated the Sixth Amendment or Due Process Clause, but we see no reason to depart from the normal interpretation of the phrase 'affecting substantial rights.'

"The question, then, is whether the instant violation of Rule 24(c) prejudiced respondents, either specifically or presumptively. In theory, the presence of alternate jurors during jury deliberations might prejudice a defendant in two different ways: either because the alternates actually participated in the deliberations, verbally or through 'body language'; or because the alternates' presence exerted a 'chilling' effect on the regular jurors. See [*U.S. v.* ]*Watson*, *supra*, [669 F.2d 1374] at 1391 [11th Cir.1982]; *United States v. Allison*, 481 F.2d 468, 472 (CA5–1973). Conversely, 'if the alternate in fact abided by the court's instructions to remain orally silent and not to otherwise indicate his views or attitude ... and if the presence of the alternate did not operate as a restraint upon the regular jurors' freedom of expression and action, we see little substantive difference between the presence of [the alternate] and the presence in the jury room of an unexamined book which had not been admitted into evidence.' *Id.,* at 472.[23]

"... Respondents have never requested a hearing, and thus the record before us contains no direct evidence that the alternate jurors influenced the verdict....

"Nor will we presume prejudice for purposes of the Rule 52(b) analysis here. The Court of Appeals was incorrect in finding the error 'inherently prejudicial.' [*U.S. v. Olano,*] 934 F.2d, [1425] at 1439 [9th Cir.1991]. Until the close of

---

**23.** *But see* the Maryland case of *Wernsing v. General Motors Corp.,* 298 Md. 406, 470 A.2d 802 (1984)(holding that the trial court abused its discretion in denying a new trial where the jury had taken a dictionary that had not been admitted into evidence into the jury room and had improperly referred to and relied on the dictionary's definition of "legal cause" that was at variance with the definition of "proximate cause").

trial, the 2 alternate jurors were indistinguishable from the 12 regular jurors. Along with the regular jurors, they commenced their office with an oath ... received the normal initial admonishment, heard the same evidence and arguments, and were not identified as alternates until *after* the District Court gave a final set of instructions. In those instructions, the District Court specifically enjoined the jurors that 'according to the law, the alternates must not participate in the deliberations,' and reiterated, 'we are going to ask that you not participate.' *Ibid.*"

*Olano,* 507 U.S. at 739–40, 113 S.Ct. at 1780–81, 123 L.Ed.2d at 522–24 (some citations omitted). As the Court's analysis of "inherent prejudice" demonstrates, it is willing to presume prejudice in certain situations, although an alternate juror, who has been properly instructed not to deliberate, sitting in on the deliberations of a jury is not such a situation. While *Smith* and *Olano* may somewhat limit the scope of presumptive prejudice, they do not preclude such a presumption in all situations, *i.e.,* where excessive or egregious jury misconduct or improper contact by a third party occurs.

The parties in the case *sub judice* outline wide-ranging decisions of the various Circuit Courts in their interpretations of the Supreme Court's *Remmer* doctrine. *See United States v. Boylan,* 898 F.2d 230, 261 (1st Cir.1990); *United States v. Console,* 13 F.3d 641, 665–66 (3rd Cir.1993); *United States v. Cheek,* 94 F.3d 136, 139–42 (4th Cir.1996); *Stockton v. Virginia,* 852 F.2d 740, 743–45 (4th Cir.1988); *United States v. Sylvester,* 143 F.3d 923, 934 (5th Cir.1998); *United States v. Walker,* 1 F.3d 423, 431 (6th Cir.1993); *United States v. Hall,* 85 F.3d 367, 371 (8th Cir.1996); *United States v. Dutkel,* 192 F.3d 893, 896 (9th Cir.1999); *United States v. Scull,* 321 F.3d 1270, 1280 n. 5 (10th Cir.2003); *Parker v. Head,* 244 F.3d 831, 839 n. 6 (11th Cir.), *reh'g and suggestion for reh'g en banc denied,* 260 F.3d 628 (11th Cir.), *cert. denied,* 534 U.S. 1046, 122 S.Ct. 627, 151 L.Ed.2d 548 (2001); *United States v. Perkins,* 748 F.2d 1519, 1533 (11th Cir.1984); *United States v. Williams–Davis,* 90 F.3d 490, 496–97 (D.C.Cir.1996), *cert. denied,* 519 U.S. 1128, 117 S.Ct. 986, 136 L.Ed.2d 867 (1997).

The State argues that a *Remmer* presumption may only occur in cases of jury tampering. *See Cheek*, 94 F.3d at 138; *Dutkel*, 192 F.3d at 896. This argument is unpersuasive in light of *Turner, supra*, and its similarity to the egregious facts in the case at bar. In fact, jury tampering, as *Dutkel* defines it, "an effort to influence the jury's verdict by threatening or *offering inducements* to one or more of the jurors," *Dutkel*, 192 F.3d at 895 (emphasis added), is akin to what can possibly occur in situations like the case at bar. A police prosecution witness having lunch with a juror during the trial might possibly be construed, in essence, as being an "inducement." It might appear to be an attempt, outside of the confines of the trial itself, to establish rapport with the juror, and thus to enhance the State's position. Whether that "inducement" is meant to intentionally affect the juror's deliberations is of no consequence. The harm done is patent due to the difficulty of proving such contentions post-verdict where in Maryland the court's ability to inquire into jury motives is, to a large degree, proscribed by rule. Therefore, a presumption of prejudice is appropriate in such cases.

In fact, the Supreme Court has spoken to circumstances where such an inherent prejudice exists. In *Turner, supra*, a case subsequent to, but not reliant on, *Remmer* and cited by *Olano*, the United States Supreme Court dealt with such concerns in a situation, similar and instructive to the case at bar, where two State's witness, Deputy Sheriffs Rispone and Simmons, had extensive contacts with the entire jury during the three-day sequestration. In that case, the jury, pursuant to local law,[24] was to be continuously in the company of a deputy sheriff during the trial. Deputies Rispone and Simmons were two of several parish deputy sheriffs that drove the jurors to and from the hotel, took them to restaurants, ate with them, talked and associated with them and even ran

---

24. Specifically, the Supreme Court stated in *Turner*, "The members of the jury were sequestered in accordance with Louisiana law during the course of the trial, and were 'placed in charge of the Sheriff' by the trial judge." *Turner*, 379 U.S. at 467–68, 85 S.Ct. at 547, 13 L.Ed.2d at 426 (footnote omitted).

errands for them. After each of the deputies testified, Turner's counsel brought separate motions for a mistrial. The trial court, however, denied the motions after a hearing because there was no showing that the deputies had discussed the case with any of the jurors. When the trial continued, the deputies resumed their roles as caretakers of the jury. After a verdict was rendered, Turner filed a motion for a new trial. The Supreme Court said:

"The question ... goes to the nature of the jury trial which the Fourteenth Amendment commands when trial by jury is what the State has purported to accord....

"The requirement that a jury's verdict 'must be based upon the evidence developed at the trial' goes to the *fundamental integrity of all that is embraced in the constitutional concept of trial by jury.* 'The jury is an essential instrumentality—an appendage—of the court, the body ordained to pass upon guilt or innocence. Exercise of calm and informed judgment by its members is essential to proper enforcement of law.' *Sinclair v. United States,* 279 U.S. 749, 765, 49 S.Ct. 471, 476, 73 L.Ed. 938 [1929]. Mr. Justice Holmes stated no more than a truism when he observed that 'Any judge who has sat with juries knows that, in spite of forms they are extremely likely to be impregnated by the environing atmosphere.' *Frank v. Mangum,* 237 U.S. 309, at 349, 35 S.Ct. 582, at 593, 59 L.Ed. 969 [1915] (dissenting opinion).

"In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel. *What happened in this case operated to subvert these basic guarantees of trial by jury.* It is to be emphasized that the testimony of Vincent Rispone and Hulon Simmons was not confined to some uncontroverted or merely formal aspect of the case for the prosecution. On the contrary, the credibility which the jury attached to the testimony of these two key witnesses must

inevitably have determined whether Wayne Turner was to be sent to his death. To be sure, their credibility was assailed by Turner's counsel through cross-examination in open court. *But the potentialities of what went on outside the courtroom during the three days of the trial may well have made these courtroom proceedings little more than a hollow formality.*

"It is true that at the time they testified in open court Rispone and Simmons told the trial judge that they had not talked to the jurors about the case itself. But there is nothing to show what the two deputies discussed in their conversations with the jurors thereafter. *And even if it could be assumed that the deputies never did discuss the case directly with any members of the jury, it would be blinking reality not to recognize the extreme prejudice inherent in this continual association throughout the trial between the jurors and these two key witnesses for the prosecution.* We deal here not with a brief encounter, but with a continuous and intimate association throughout a three-day trial—an association which gave these witnesses an opportunity, as Simmons put it, to renew old friendships and make new acquaintances among the members of the jury.

"*It would have undermined the basic guarantees of trial by jury to permit this kind of an association between the jurors and two key prosecution witnesses who were not deputy sheriffs.* But the role that Simmons and Rispone played as deputies made the association even more prejudicial. For the relationship was one which could not but foster the jurors' confidence in those who were their official guardians during the entire period of the trial. And Turner's fate depended upon how much confidence the jury placed in these two witnesses."

*Turner,* 379 U.S. at 471–74, 85 S.Ct. at 549–50, 13 L.Ed.2d at 428–29 (citation omitted)(footnotes omitted)(emphasis added). As we will discuss *infra,* we believe that the case *sub judice* is more akin to *Turner* than to *Remmer* or its progeny and thus warrants a presumption of prejudice against petitioner.

As our analysis indicates, we do not agree that the *Remmer* presumption or *Turner* precedent has been eroded in cases where *egregious* juror *and* witness *misconduct* occurs, such as when a witness and a juror go to lunch together during the middle of a trial when both have been admonished, in one way or another, to avoid each other. Even if we have misread *Smith* and *Olano* and the Supreme Court has intended to erode the presumption of prejudice in cases such as the case *sub judice,* an interpretation with which we do not agree, we hold that Maryland's own Declaration of Rights requires such a presumption in limited egregious cases of juror *and* witness misconduct to insure that a criminal defendant receives adequate due process. A right as fundamental as the right to an impartial jury cannot be compromised by even the hint of possible bias or prejudice that is not affirmatively rebutted.

Even if the presumption of prejudice doctrine does not exist for all cases of misconduct, in the case at bar, the non-incidental, intentional and personal nature of the conversations and luncheon between Detective Pikulski and Juror McDonald was so egregious that we believe this case falls within the concept of egregious actions in *Remmer* and certainly in *Turner* and, thus, must be considered to be presumptively prejudicial to petitioner. There is no question that the conduct of both Detective Pikulski and Juror McDonald constituted misconduct; the State concedes this issue. An examination of the gross and excessive nature of the misconduct, however, illustrates its potential to greatly prejudice petitioner. First, both the detective and juror were admonished not to interact with the other during the course of the trial. Specifically, Detective Pikulski, an experienced detective with 22 years on the police force, who had testified previously in several other cases, remained under subpoena and was subject to be recalled to the stand. The trial court specifically subjected the detective to its rule on witnesses when, after Detective Pikulski concluded her testimony, the trial court specifically stated:

"You may step down and ... you are subject to the subpoena but you may leave. There is a rule on witnesses

*so don't discuss your testimony with any other witness or permit any other witness to discuss their testimony with you. We will notify you if we need you at a future time."*

Juror McDonald received an even stronger instruction when the trial court, at the trial's outset, set forth its rule on juror contact with other parties specifically including witnesses. The jury was admonished several times not to have any conduct with witnesses when the trial court stated:

"I want to do everything I can to keep you apart from any persons who might be testifying as witnesses in this case, and since they tend to congregate right outside, I want to put some physical distance between the two of you so that you [do] not overhear anything perhaps that you should not hear.

"Which [leads] to my next thing: When you return, and actually is part of the instructions I will give to you at the end of the case, you are going to be advised that you must decide this case based only upon the information that comes to you here in this courtroom and nothing else.

"So, therefore, you must do everything reasonable within your power to avoid contact with any of the witnesses, parties, or persons you see in close contact with them outside of the courtroom.

"Don't let anybody speak to you about this case, and don't speak to anyone about it yourself. Don't even speak among each other about this case.

"So I'm going to excuse you with that admonition. Do everything that you can reasonably and possibly do to make sure that nobody says anything to you about this case outside of the information that's going to come to you about it inside the courtroom.

. . .

". . . any time we do take the recess, please leave the courtroom. Do not take them in the jury room, and please assemble at the far end of this hall away from any potential

witnesses or persons who might be in contact with any of the parties.

. . .

"Please do not allow yourself to overhear anyone discussing the case. Do not have any contact outside the courtroom with any of the parties, *witnesses,* or lawyers.

. . .

"*If anything does occur, contrary to these instructions, please write a note as soon as possible.* Do not discuss it with any other member of the jury, and give it to my law clerk . . . and he will bring it to my attention.

"Again, upon any recess, as I mentioned, do not discuss the case with anyone or let anyone discuss the case with you or in your presence. This would include other jurors, courtroom personnel, friends, and relatives, spectators, and/or reporters.

"*In addition, please avoid any contact with the parties, lawyers, and witnesses involved in this case.*

"If anyone tries to discuss the case with you *or if anything questionable occurs, again, please write a note as soon as possible.* Do not discuss it with any other juror." [Emphasis added.] [Alterations added.]

There was nothing more the trial court could do. It had the right to expect the jurors and witnesses to comply with its orders.

■ While both parties agree that the interaction between Pikulski and McDonald during the weekend religious retreat was improper, the parties differ somewhat in their interpretations of the gravity of the matter. We agree that not all incidental contacts between jurors and witnesses are inherently prejudicial. Some of the contact between Pikulski and McDonald in this case, although it violated the court order, may have been somewhat innocuous and incidental. When viewed in its entirety, however, the totality of the intentional contacts between the Pikulski and McDonald exhibit cause for

serious concern and thus undermine the very integrity of the trial process itself.

For example, mere casual contact at a religious retreat normally will not likely rise to the level of inherent prejudice. McDonald's initial, intentional, approach and conversation with Pikulski at the retreat, violated the trial court's order to "avoid any contact with the parties, lawyers, and witnesses involved in this case," even though it might be argued to be akin to casual contact. In fact, testimony at the hearing elicited facts which suggest that the initial contact may have even been made for benign purposes, *i.e.,* to make it clear that they should not have further contact. Detective Pikulski did not even recognize McDonald as a juror and her statement to him, "Oh, you're one of the ones that convicted him?,"[25] may even be outside the realm of egregious conduct, as it might follow from the evidence brought out in the hearing that this statement was not in reference to petitioner's case.[26] While the two agreed not to discuss the case, and although there is no express evidence that they did do so, their testimony illustrates that both were cognizant of the judicial order forbidding *any* contact between the two and that they both violated the court's orders.

In spite of being well aware of the prohibition on any further interaction, the two did not avoid sitting next to each

---

**25.** *This statement comes from the testimony of Detective Pikulski. Juror McDonald testified that Pikulski said, "Oh, did you, you know, did you find him guilty?" Both statements elicit the same meaning regardless of the exact wording, i.e., suggesting that a jury found a defendant guilty in a case where Pikulski testified.*

**26.** McDonald's testimony suggests that, at that point, he was generally concerned with avoiding contact with Pikulski and not violating the trial court's order. In fact, after the Detective asked the previously mentioned question, McDonald said, "I can't talk about it." Further conversation brought out that McDonald was a juror on a sitting jury and thus the two agreed that they could not talk about the case at all. They also testified that Pikulski avoided any talk of her work as a police officer. McDonald, however, had been further admonished, not only not to discuss the case, but to avoid contact with witnesses. He not only did not avoid further contact, he initiated it in direct violation of the trial court's order.

other during the seminar on the following day. Even if this was merely coincidental, their following actions unquestionably crossed the line between incidental contact and more egregious violations of the trial court's orders. After the seminar was completed several hours earlier than its scheduled time, McDonald asked Pikulski whether she would like to eat lunch with him. It is difficult to fathom how a veteran police detective with 22 years experience as a police officer, could believe it to be acceptable for her in mid-trial to go to lunch with a juror in a criminal case for which she remained under subpoena and under the rule on witnesses. While the juror initiated the offer and his conduct was also a direct and substantial violation of the trial court's order to him, the detective had the last chance to avoid further contact and did not do so. In fact, after an hour and a half lunch together where they discussed details of their personal lives, Pikulski chose to extend the contact further by giving McDonald a ride to his car in her own personal vehicle. Furthermore, neither the detective nor the juror reported the incident in a timely manner, despite the trial judge's explicit admonishment to the jury to immediately report *any* contact or questionable behavior to the court. In sum, the juror and State's witness spoke of the trial, knew of each other's role, intentionally violated a court order, participated in a religious retreat,[27] went to lunch

---

27. At the June 20, 2001 hearing, petitioner argued:

"it just so happened that when they were arranging the chairs in a circle for the passing of the Sacrament that he was seated next to Detective Pikulski.

"Now we are in a room of 28 to 30 people and now by chance they [McDonald and Pikulski] are just sitting next to each other, and they are involved in what is commonly known to be an intensely intimate religious ritual, which depending on how you interpret the Bible, is either-you are either literally eating the body of Christ and drinking the blood of Christ or you are doing it symbolically.

"It is the passing of the Sacrament, and they have a communication during the passing of the Sacrament.

"Afterwards, they—and I am quoting, Counsel, page 44 lines 8 through 11.

"Now again here we have these two individuals, previously unknown, in a group of 28 to 30 people and then Mr. McDonald testifies:

together, discussed personal details of their lives during the middle of the trial and then failed to timely report the misconduct to the proper authorities.

These gross violations of the court's orders inherently prejudice petitioner in this case. The conduct here wasn't purely incidental. It became more. It closely resembles the witnesses' conduct in *Turner, supra,* and in our view is even more egregious. In *Turner,* the deputies' contacts with the jury were, in large part, caused by the fact that they were directed by their superiors to accompany the jury. While the witnesses in *Turner* similarly did not discuss the details of the case, they had no choice but to follow orders and thus have three days of close contact with the jury and were made responsible for the jury's safety and errands; while the egregiousness of the two situations is nonetheless comparable, the conduct here is actually more objectionable. Here, there was similar improper juror contact with a witness, but, unlike *Turner,* there was juror misconduct as well. The jurors in *Turner* did not intentionally violate any court order; they merely were subjected to the care, presence and conversation

---

'And then after—and then some conversation at the end of the—conclusion of the retreat about—about lunch and then—so we—there was a restaurant next door—that we went there and had lunch.'

"Now so here you have, in the middle of trial, you have a juror and a detective, who the night before have had some recognition of their mutual involvement in this criminal case and, you know, we can-there-it is fairly debatable how we want to interpret what was said and what the impact of ... what was said and the materiality of all of that, but they go back the next day and rather than having no dealings with each other, now suddenly they are seated next to each other.

"They participate jointly in this religious ritual and then they head off to lunch.

"They have lunch together and then at the conclusion of that the detective, in her personal vehicle, drives the juror over to a service station to get his car, and you know, what were they talking about at lunch?

"Well, Detective Pikulski testifies at page 22 of the transcripts, lines three through ... five, okay, this is the question:

'Question: Okay, and during this conversation, you shared personal things about yourself and he shared personal things about himself in terms of your family, correct?'

'Answer: Yes.' " [Alteration added.]

of the bailiffs who happened to be witnesses for the State. Here, Juror McDonald intentionally sought out contact with Pikulski and asked her to join him for lunch. And for whatever reason, *she went.* This is surely at least as suspect as acquiescing to innocuous conversation with a caretaker. While the prejudice may manifest itself in different ways in these two cases, the egregiousness and resulting presumption of prejudice is at least as strong here, if not stronger than in *Turner.*

In fact, the trial judge specifically found that the intentional contact between Detective Pikulski and Juror McDonald would enhance Pikulski's credibility in the mind of McDonald. The juror's blatant disregard for the trial court's order and the witness' lack of common sense in light of extensive experience, suggest that the impressions from the extensive mid-trial contact between them may have had a far reaching effect. For instance, the juror could have wanted to curry favor with the detective. The juror, subconsciously or consciously, could have been persuaded toward the side of the State in an effort not to disappoint or anger Pikulski. The improper contact could have lent more credibility to all police witnesses and to their investigation itself.[28]

---

**28.** One of the defense's strategies centered on another suspect who the police chose not to pursue in their investigation. A substantial credibility enhancement of a detective involved in the investigation that was conducted might substantially affect how a juror would see the entire investigation's credibility. The Court of Special Appeals disagreed with the possibility of a bias in favor of the entire police force. It stated:

"As we have explained, the trial court also rejected the appellant's argument that McDonald's positive credibility assessment of Pikulski based on their improper contact had prejudiced him by in turn enhancing his view of the entire police department. The court reasoned that the mere fact that McDonald may have been more inclined to believe Pikulski after spending time with her at the religious retreat did not reasonably support a finding that he would favor the police force's version of how their investigation was conducted over the appellant's. As the court pointed out, there was nothing about the nature of the contact between Pikulski and McDonald that would have led McDonald to view Pikulski as a representative of the entire police force or to generalize his view of her

Moreover, the newly formed relationship between Juror McDonald and Detective Pikulski denied petitioner the right to inquire about such a relationship in a pre-trial *voir dire* type of examination of Juror McDonald. During pre-trial *voir dire*, the Court asked the following to the prospective juror members, including McDonald: [29]

"Ladies and gentlemen, for this next question, I'm going to read to you a long list of witnesses in this case. Please wait until I have read the entire list, and thereafter I will ask you whether or not any of you know any of the persons who may testify as witnesses in the case or perhaps, as more often is the case, simply their names are mentioned

character to the police force as a whole. This reasoning is sound and supported by logic.

"In addition, the appellant's argument is belied by the strategy he followed at trial. As noted above, the *defense* urged the jurors to believe Pikulski's testimony, apparently without any concern that their doing so would have the 'spillover' effect of making the police force's version of the investigation more believable than the appellant's version. The defense would not have adopted a strategy to tout Pikulski's credibility to the jury if the strategy was likely to harm its 'sloppy police investigation' defense theory."

*Jenkins*, 146 Md.App. at 114, 806 A.2d at 700. We disagree. Regardless of the defense's strategy, possible favorable bias toward the police in general might arise from the contacts between Juror McDonald and the witness, Pikulski. We do not mean to imply that it necessarily did. What, if anything, went through the mind of the juror in this case is not the ultimate question; it is that the possibility existed. As we indicate elsewhere, we see that a separation of the two credibility assessments by a trial court at a post-verdict hearing would be difficult, if not impossible.

29. The affirmative answers discussed in the record refer only to Juror 21. Juror 21, however, was Mr. McDonald. Mr. McDonald responded in the affirmative to questions regarding whether any members of the jury or their immediately families had ever been charged with a crime, excluding minor traffic offenses, or whether the same had been a witness in a criminal case, or whether the same had been a victim of crime. He indicated that his mother had been a victim of fraudulent phone calls but that it would not affect his impartiality. The record also shows that McDonald also responded affirmatively to the question asking whether anyone close to the juror has had legal or medical training, because his mother and brother are doctors. He, again, indicated that this would not affect his impartiality.

during the course of the trial as having had some involvement one way or the other.

"The potential witnesses are as follows, ... these are members of the Montgomery County Police Department–Detective Pat Pikulski, ....

"Now, ladies and gentlemen, I'm going to read to you from another list, and there may be substantial overlaps....

"... Detective Pikulski...."

McDonald responded in the affirmative to this question because he thought that he may have known Officer Ferguson, who McDonald believed had previously given him a traffic citation. Once it was deduced that Officer Ferguson was a police officer from Rockville and not from Montgomery County, where McDonald had received the ticket, McDonald realized that he did not know Officer Ferguson. McDonald indicated that even if Ferguson gave him a ticket, it would not have mattered to his impartiality.

As McDonald did not respond in the affirmative to knowing Detective Pikulski at the time, because he had not yet met her, he could not be questioned pre-trial during *voir dire* about how knowing her would affect his deliberative process. Once he met Detective Pikulski mid-trial, he effectively deprived petitioner of inquiring about how this relationship would affect McDonald's impartiality. In not immediately reporting the incident to the trial court, Detective Pikulski and Juror McDonald further circumvented petitioner's right to *voir dire* a juror regarding his existing relationship with a witness. Petitioner was under the assumption that McDonald had no personal relationship with any witness. The situation here is the practical equivalent of condoning a potential juror lying in his answer to such a question during *voir dire*. Petitioner was essentially denied his right to strike McDonald for cause or using one of his peremptory challenges after a *complete* examination on *voir dire*.

Finally, and most importantly, condoning such conduct as occurred here as non-prejudicial would compromise the

impartiality basis for jury trial process in our adversary system. A State's witness in a criminal case accepting an invitation of a juror to join that juror for lunch during the trial, and then failing to immediately report the contact to the proper authorities, might conceal an ulterior motive or hidden agenda. Even if that is not the case, the inherent appearance of impropriety casts a shadow over the trial process, which necessarily diminishes the integrity of the system in minds of defendants and the public itself.[30] In essence, the egregious circumstances created by McDonald and Pikulski in this factu-

---

**30.** The State argues that petitioner's use of a public outrage and integrity of the courts argument was not raised in the lower court. The Court of Special Appeals agreed, stating:

"Finally, we agree with the State that the appellant did not preserve the argument that the trial court should have granted him a new trial to protect a positive public image for the criminal justice system. In his 'Supplemental Memorandum and Request to Strike Testimony,' ... the appellant cited two newspaper articles about the case. Then, at the ... hearing on the motion for new trial, the appellant suggested in argument to the court that McDonald may have read the articles and, realizing that 'there was essentially an uproar over that type of contact during the course of trial between an agent of the State and a juror,' may have 'attempt[ed] to minimize or disregard the comments by the detective.' At no point below did the appellant argue that public controversy or the public's reaction over the contact between Pikulski and McDonald warranted granting a new trial. 'Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court.'

"Even if this issue had been raised below, the appellant would fare no better. To be sure, in a general sense, how the public perceives the criminal justice system affects whether defendants receive fair and impartial trials. We are dealing in this appeal with a particular defendant and a particular trial, however, and the specific question whether an instance of improper contact between a witness for the State and a juror, during the trial, was prejudicial."

*Jenkins*, 146 Md.App. at 115–16, 806 A.2d at 700–01 (citations omitted). We do not see arguments based on preserving the integrity of the courts and diminishing public outrage with a system as separate issues from the one in the case *sub judice*. It is merely an argument supporting petitioner's contention on the ultimate issue in this case-whether petitioner was denied a trial by an impartial jury. Petitioner additionally discussed the outrage of another juror at the trial court level, discussed *infra*, which illustrates how the public is affected by such misconduct. In any event, this Court has an inherent right in, and thus may always address issues involving, the integrity of the judicial system as a whole.

ally narrow situation place a significant burden on the State to refute all possible prejudices. While we cannot, for certain, affirmatively state that any such biases or prejudices occurred in this case,[31] we can be sure that the possibility for such was strong in light of the substantial and personal contact between the juror and the State's witness during the trial.

■ The State, nonetheless, contends that if such a presumption of prejudice exists in this case, that it was successfully rebutted. We do not agree. The State argued that while Pikulski's credibility[32] was possibly enhanced in McDonald's mind, the defense nonetheless benefitted from Pikulski's testimony. The determinative issue here is not whether Detective Pikulski is believable, but whether McDonald would be more likely to, irrespective of her testimony, render a verdict favorable to the State because of his relationship with the detective. Was McDonald likely, or possibly likely, to further the State's case during jury deliberations, not because of a belief in the evidence, but because of a desire, for whatever reason, to please his new found friend, the detective. We will never know, and when the issue of jury bias arises after the verdict has been accepted and the jury discharged, it is, because of Md. Rule 5–606, almost impossible to resolve.

It is the strong possibility of prejudice which invokes the presumption and the State must effectively rebut all reasonable possibilities in cases such as the one at bar. The only method of affirmatively rebutting whether McDonald's contact with Pikulski in the narrow circumstances of this case was

---

**31.** *See infra,* for discussion of Maryland Rule 5–606.

**32.** While petitioner countered the State's argument by arguing that he did not universally challenge Pikulski's credibility on all issues, it is of no consequence to our holding as we hold that the State failed to rebut several other possible prejudices, including the effect such conduct has on the justice system as a whole. In addition, whether Pikulski's role at trial was pivotal has no bearing on our decision, because prejudice caused by a State's witness going to lunch with a juror at the juror's invitation during the trial is inherent. Our decision would remain the same even if Pikulski testified merely to authenticate a document or establish a chain of custody.

prejudicial to petitioner would be to ask McDonald specific questions of how the interaction with Pikulski affected his decision-making ability, and would thus entail an examination as to McDonald's conduct during deliberations and the affect upon other jurors of McDonald's conduct. Such inquiries, if not formally impossible, are nevertheless difficult because of the need to protect, post-verdict, the sanctity of juror deliberations. If this misconduct had been brought to light before a verdict had been returned and accepted, *i.e.*, if the persons involved had not concealed their improper conduct from the parties, and from the trial court, the trial judge could have elicited answers to these very questions. He might have been able to conduct further *voir dire* to verify the continued impartiality of the petit jury because he would not have been constrained by the prohibition of Maryland Rule 5–606(b). This was not the case here because the misconduct was brought to light *after* a verdict had been rendered and accepted and thus, the trial court was limited by Maryland Rule 5–606(b). Maryland Rule 5–606 states:

"**Rule 5–606. Competency of juror as witness.**

(a) **At the trial.** A member of a jury may not testify as a witness before that jury in the trial of the case in which the juror is sitting. If the juror is called to testify, the opposing party shall be afforded an opportunity to object out of the presence of the jury.

(b) **Inquiry into validity of verdict.** (1) In any inquiry into the validity of a verdict, a juror may not testify as to (A) any matter or statement occurring during the course of the jury's deliberations, (B) the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent or dissent from the verdict, or (C) the juror's mental processes in connection with the verdict.

(2) A juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying may not be received for these purposes."

As mentioned, one of the ways to protect a defendant's constitutional right to an impartial jury is to expose the existence of factors which could cause a juror to be biased or prejudiced through the process of *voir dire* examination. *Couser,* 282 Md. at 138, 383 A.2d at 396–97. If an error dealing with witness misconduct or juror communication with third parties is discovered before or during trial, questioning the involved juror, or jurors, on the effect the error or conduct has on their ability in the future to assess the evidence impartially may be a way in which the State could rebut the presumption of prejudice to the criminal defendant.[33] In this case, however, neither the State's witness nor the juror brought their improper conduct to the attention of a court official during the course of the trial. As such, the trial court was limited in its post-verdict questioning of the juror due to Md. Rule 5–606 and its prohibition on juror testimony as to jury deliberations.

Even before the adoption of Maryland Rule 5–606 in its current form, it has long been the rule in this State that jurors cannot testify as to the deliberative processes in a manner which may impeach rendered and accepted verdicts. *Williams v. State,* 204 Md. 55, 102 A.2d 714 (1954). In *Williams,* this Court said:

---

**33.** We do not hold that this is the only way to rebut a presumption in all cases, but, during trial, a trial judge is allowed to inquire into whether misconduct or improper communications will affect the juror's ability to be impartial. In cases where the conduct is unintentional or less personal, *i.e.,* less egregious than the case at bar, lack of prejudice may likely be shown without specifically questioning the involved juror, or jurors, regarding his or her past-mental processes. Here, given the inherent bias toward the State and Detective Pikulski suggested by Juror McDonald initiating having lunch with the detective witness, such a specific inquiry as to whether the juror is able to remain impartial must occur in order to even reach an inquiry on the possibility of whether the prejudice has been sufficiently rebutted. In the end, this may not even be enough to rebut the presumption of prejudice in cases as egregious as the case *sub judice,* as the partiality of Juror McDonald may be impossible to affirmatively rebut and still maintain the integrity of the jury system. Fortunately, egregious misconduct as in the case at bar is the exception and not the rule.

"The law in Maryland is well settled that a juror cannot be heard to impeach his verdict, whether the jury conduct objected to be misbehavior or mistake. *Browne v. Browne,* 22 Md. 103, 113. The reasons for the rule have been stated by this Court in *Brinsfield v. Howeth,* 110 Md. 520, 530, 73 A. 289, in these impressive words: 'Such evidence is forbidden by public policy, since it would disclose the secrets of the jury room and · afford an opportunity for fraud and perjury. It would open such a door for tampering with weak and indiscreet men that it would render all verdicts insecure; and, therefore, the law has wisely guarded against all such testimony and has considered it unworthy of notice. It would be a most pernicious practice, and in its consequences dangerous to this much valued mode of trial, to permit a verdict, openly and solemnly declared in the Court, to be subverted by going behind it and inquiring into the secrets of the jury room.'

"Other risks sought to be averted, it has been said, are harassment of jurors by disgruntled losing parties; removal of an element of finality from judicial decisions; and through allowing jurors to swear to alleged examples of reprehensible conduct, a decrease in public confidence in the judicial process. In an offer to prove facts nullifying the verdict on a motion for a new trial, the theory for exclusion of the jurors' deliberations during retirement, their expressions, argumented, motives, and beliefs, may, according to Prof. Wigmore, embrace both the Privileged Communications Rule and the Parol Evidence Rule. 8 *Wigmore, Evidence,* Secs. 2346, 2348."

*Id.* at 67–68, 102 A.2d at 720. Here, a specific inquiry into the thought process of McDonald, and an inquiry into his actions and language during deliberations, and the affect of his actions and language on the other jury members is necessarily the only method of ascertaining whether the improper conduct improperly influenced the jury's deliberative process in the case at bar and, thus, prejudiced petitioner. The other jurors, post-verdict, might even be forbidden by the rule to testify as to McDonald's actions and statements during deliberations.

Being that Rule 5–606 precludes an inquiry as to McDonald's motives, or any other juror's motives, the prejudice against petitioner has yet to be rebutted and likely cannot be rebutted.

Additionally, the State offered no rebuttal to the damage likely caused to the integrity of the jury system in Maryland. In fact, during the post-trial hearing on this matter, defense counsel argued the following:

> "This is a highly unusual type of proceeding and I also note in one of our footnotes that another juror had contacted chambers after the story had broke in 'The Journal' and had expressed extreme displeasure for having spent two weeks involved in this trial only to find out that there was this serious defect in the proceeding whereby one of the jurors had had contact and communication with an agent of the State during the course of trial, which on its face is highly improper when ... viewed ... in the appropriate context."

This statement and the newspaper articles [34] regarding public reaction to the conduct of McDonald and Pikulski discussed in petitioner's brief, while not determinative to any degree in our opinion, are nonetheless illustrative of the questions likely to arise if such contacts between State's witnesses and jurors are not severely admonished. As the highly unusual conduct that occurred here irreparably damages the integrity of the jury trial process and we have an inherent interest in protecting the system's integrity, we cannot allow the verdict in this case to stand.

Courts in our sister states agree with our view of protecting the judicial system from this type of impropriety. In *State v. Lang*, 176 Ariz. 475, 862 P.2d 235 (1993), Detective Byers was a key witness against the defendant, as he was one of two officers that were present when the defendant purportedly gave partially incriminating statements. During a court re-

---

**34.** Petitioner cited to two newspaper articles; one appeared in the April 11, 2001 edition of *The Gazette* and the other appeared in the April 16, 2001 edition of *The Montgomery Journal.*

cess near the end of the trial, the court reporter overheard the bailiff, and later, Detective Byers, fraternizing with several members of the jury. The trial judge received this information from the prosecuting attorney after the court reporter told an acquaintance in the prosecuting attorney's office of Byers' contact with the jury. There was some ambiguity on the exact nature of the contents of the two discussions. At that time, the jury had already begun to deliberate, but had yet to return a verdict. A motion for mistrial was made based solely on Detective Byers' misconduct and the possible influence it might have over the jury. The detective, under oath, denied out-of-court contact with the jury, except for his returning a juror's checkbook to a juror who had left it in the bathroom.[35]

Upon the pre-verdict questioning of the jurors about the extent of their contact with Byers, six jurors testified that Detective Byers had conversations with them.[36] The trial court, however, denied the motion for mistrial. The appellate court reversed and remanded the case for a new trial, stating, in part:

"Detective Byers' conduct was a serious incursion on the integrity of the jury system. From our review of the record, we have no hesitation in saying that it is entirely possible that his behavior affected the verdict.... Even if

---

**35.** Detective Byers also stated that the court clerk asked him to give a juror a ride home, but that he refused because it would have been inappropriate.

**36.** The conversations entailed joking, story telling, returning of a checkbook, discussions of how the detective liked his job and how many witnesses remained. In addition, the jurors joked back to the detective and conversed with him several times.

The jurors, however, even though the verdict had not yet been rendered and accepted, were not asked about whether their verdict would be affected by the extensive contact with Byers. The trial judge limited the questioning to contacts Byers had with jurors on the day in which the court reporter overheard him converse with the jurors. The defense did not attempt to ask the jury questions on whether the contact would affect their verdict, so the appellate court did not address that issue. Citing to *Turner, supra,* they reversed based solely on the extensive misconduct of Byers.

the jurors had been questioned in depth about the effect of the conduct between them and the detective and had denied that their verdict had been influenced thereby, it would be almost impossible in this case to discern with any degree of confidence whether the defendant had really received a fair trial. It was an abuse of discretion to find otherwise."
*Lang,* 176 Ariz. at 483–84, 862 P.2d at 243–44.

In *People v. Pierce,* 24 Cal.3d 199, 155 Cal.Rptr. 657, 595 P.2d 91 (1979), a prospective juror, Seymour, indicated that he was a neighbor of one of the first policemen, prosecution witness Officer Case, to arrive at the scene of a homicide and that he was "Very, very familiar" with the case from talking to Officer Case. Seymour proffered that he would not give special weight or credibility to Case's testimony and that he would not discuss the case outside of the courtroom. Seymour was not challenged as a juror and was elected jury foreman. During the defense's case, Seymour approached Case and asked him questions about the prosecution's case against the defendant. After a verdict was returned, one of Case's supervisors overheard Case discussing the incident, reported it to the proper authorities and an investigation followed. The trial court denied the defendant's motion for a new trial relying only on the investigatory reports and without holding an evidentiary hearing. The California Supreme Court granted a new trial because of Case's and the juror's serious and egregious misconduct, even where the other 11 jurors submitted affidavits that Seymour did not discuss these conversations with them. That court stated:

"that evidence [relating to the 11 juror affidavits] would not have rebutted the presumption that the 12th juror, Seymour, was not impartial. [The defendant] was 'entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors.' It would be sheer speculation to assume that absent his conversation with Case, Seymour would necessarily have voted to convict; rather, he might well have held out for acquittal, or even succeeded in persuading his fellow jurors that a reasonable doubt as to [the defendant's] guilt existed. Because a defendant charged with a crime has a

right to the unanimous verdict of 12 impartial jurors, it is settled that a conviction cannot stand if even a single juror has been improperly influenced."

*Pierce*, 24 Cal.3d at 208, 155 Cal.Rptr. 657, 595 P.2d at 95–96 (citations omitted)(alterations added).

The Supreme Court of Indiana has held that the possible taint of a jury member was impossible to remove where an officer witness approached a juror, whom he had not seen, outside of the trial in 15 years, eating lunch in a restaurant during a trial recess, engaged him in conversation and the juror invited the officer to his home to watch a boxing match the following weekend. That court's words are directly relevant to the case *sub judice:*

> "juror conduct *with witnesses* occurring *contemporaneously to the trial proceeding* are of a different character and *more directly implicate the public's trust and confidence in our criminal justice system. Under certain circumstances, the extra-judicial juror conduct is so fundamentally harmful to the appearance of the fair and impartial administration of justice, it will be considered 'prima facie prejudicial' to the defendant,* irrespective of whether the communication concerned a matter pending before the jury."

*May v. State*, 716 N.E.2d 419, 422 (Ind.1999)(some emphasis added).

Similarly, in *Kelley v. State*, 555 N.E.2d 140 (Ind.1990), a security guard who was the sole State's witness in a criminal theft case had improper contact with jury members. Specifically, after the trial court had ordered a lunch recess and had admonished the jury not to discuss the theft case with any other person, the witness guard ate lunch with three of the six jurors. The trial court held a hearing in which testimony was presented that the security guard was heard to have specifically stated to the jurors, "I seen him do it," although it was unknown whether this comment referred to the current trial. *Id.* at 141. The trial judge additionally questioned the jurors specifically regarding their ability to remain impartial and, as they all responded in the affirmative, the judge denied the

defendant's pending motion for mistrial. The Supreme Court of Indiana found an abuse of discretion, stating:

"Despite the lack of clear evidence that the security guard and the jurors discussed the trial proceedings and despite the three jurors' assertions that their impartiality was intact, the enhancement of the credibility of the prosecution's witness seems highly probable, regardless of whether the jurors themselves realized it at the time. As stated in Judge Miller's dissent to the Court of Appeals decision in the present case:

'[A]s it pertains to the issue of witness credibility, the prejudice which results from a juror's association with the prosecutorial witness can be an invisible prejudice (or bias) which festers within the subconscious mind of the fact finder. The taint caused by an improprietous association may be impossible to remove.

'[T]he complained of conduct in the present case was of such a prejudicial and inflammatory nature-based on the probable persuasive effect of the conduct *on the jury's ability to assess witness credibility*-as to place Kelley in a position of grave peril to which he should not have been subjected and ... no action other than a mistrial could have remedied the perilous situation into which he was placed.'

(slip opinion, dissenting opinion at 4–5) (emphasis in original).

"We agree. The trial judge abused his discretion in denying the defendant's motion for a mistrial. We therefore grant transfer, vacate the decision of the Court of Appeals, reverse the trial court and remand for a new trial."

*Id.* at 142. *See also Woods v. State*, 233 Ind. 320, 324, 119 N.E.2d 558, 561 (1954)(where the Supreme Court of Indiana held that the police officers'/state's witnesses' conduct in visiting with jury members was "prima facie prejudicial" to the criminal defendant).

In *Simants v. State*, 202 Neb. 828, 277 N.W.2d 217 (1979), Sheriff Gilster, a prosecution witness, visited the motel where

the jurors in a murder trial involving multiple victims were sequestered. While there, he conversed, associated and played cards with members of the jury.[37] The sheriff testified that he did not discuss the case with the jurors, but that he did visit the motel three times. Several jurors testified to conversations with the sheriff regarding his experiences of being a sheriff and of his previous trial experience, but the sheriff denied such conversations. The trial court found the misconduct to be harmless and denied the defendant's writ of error coram nobis. On appeal, the Supreme Court of Nebraska stated:

> "A fair trial before a fair and impartial jury is a basic requirement of constitutional due process. To condone the conduct of Sheriff Gilster in this case would violate the fundamental integrity of all that is embraced in the constitutional concept of a fair trial by a fair and impartial jury. The stability and integrity of the American system of justice demands that those principles be maintained inviolate. Under the circumstances here the convictions and sentences of the defendant must be vacated and the cause remanded to the District Court for further proceedings."

*Simants v. State,* 202 Neb. at 839, 277 N.W.2d at 223.

The Utah Supreme Court, in *State v. Pike,* 712 P.2d 277, 280 (Utah 1985), used a rebuttable presumption of prejudice when the rule against improper juror contact with witnesses was violated because, in part, of "the deleterious effect upon the judicial process because of the appearance of impropriety." That Court stated:

> "Due consideration for the potential and *often unprovable tainting of a juror by contacts between jurors and others involved in a trial that are more than brief and inadvertent encounters, leads us to reaffirm the proposition that a rebuttable presumption of prejudice arises from any unau-*

---

37. In addition, the trial judge visited the same motel on two occasions to ensure the sequestration orders were being followed. He did not discuss the case with any of the jurors. This trial judge withdrew from the proceedings.

*thorized contact during a trial between witnesses,* attorneys or court personnel and jurors which goes beyond a mere incidental, unintended, and brief contact. *The possibility that improper contacts may influence a juror in ways he or she may not even be able to recognize and that a defendant may be left with questions as to the impartiality of the jury, leads to the conclusion that when the contact is more than incidental, the burden is on the prosecution to prove that the unauthorized contact did not influence the juror.*

"In this case, an important prosecution witness, who was both the arresting officer and a witness at the scene of the altercation, engaged in conversation in the hall of the courthouse during a recess with three jurors regarding a personal incident, i.e., an accident he had sustained while cleaning his patio which caused him to limp. Immediately after the court reconvened, the trial court questioned the officer in camera on the record about the conversation. The questioning was brief and did not disclose the entire contents of the conversation. There is no other evidence as to the scope and subject matter of the conversation since a transcript of the post-verdict questioning of the jurors has not been provided on this appeal. From what is reported in the transcript of the first hearing on the matter, the conversation amounted to more than a brief, incidental contact and no doubt had the effect of breeding a sense of familiarity that can clearly affect the juror's judgment as to credibility, and was sufficient to warrant a presumption of prejudice. Indeed, even if the jurors had denied that they were influenced by the encounter in the post-trial hearing, that is not enough to rebut the presumption of prejudice. Accordingly, the conviction must be reversed and the matter remanded for a new trial."

*Id.* at 280–81 (emphasis added).

In addition, the Supreme Court of North Carolina stated: "Our jury system depends on the public's confidence in its integrity. We *must zealously guard against any actions or situations which would raise the slightest suspicion that the jury in a criminal case had been influenced or tampered*

*with so as to be favorable to either the State or the defendant. Any lesser degree of vigilance would foster suspicion and distrust and risk erosion of the public's confidence in the integrity of our jury system.* Allowing the spouse of the prosecutor to serve as the bailiff in charge of the jury could lead some with cynical minds to believe that the jury could have been improperly influenced in some manner. We wish to emphasize that there is absolutely nothing in the record to remotely suggest that the bailiff actually attempted to influence the jury in any manner. However, whether any tampering or attempted tampering took place is irrelevant. It is the *appearance* of the *opportunity* for such influence that is determinative."

*State v. Wilson,* 314 N.C. 653, 656, 336 S.E.2d 76, 77 (1985)(some emphasis added). *See also State v. Mettrick,* 305 N.C. 383, 385, 289 S.E.2d 354, 356 (1982)(holding that prejudice is "conclusively presumed" where a witness was acting as a custodian of a jury because of the "cynical minds" that would leap to a conclusion that tampering or prejudice had occurred). Similarly to the sentiment expressed in these cases, allowing a State's witness and a juror to have lunch together during the middle of a trial, where they discussed personal feelings and occurrences within their own private lives, "would foster suspicion and distrust and risk erosion of the public's confidence in the integrity of our jury system." *Wilson,* 314 N.C. at 656, 336 S.E.2d at 77.

### III. Conclusion

■ In conclusion, we hold that, under the highly unusual circumstances of the case at bar, in a criminal prosecution, when a juror and a witness have significant and intentional mid-trial personal conversations and contact in violation of court orders, such as having lunch together, there is an inherent, and given the constraints of Maryland Rule 5–606, virtually irrefutable, prejudice to the defendant when, as in the case *sub judice,* the misconduct is concealed until after the verdict has been rendered and accepted and the jury discharged. We hold that the prejudice in this case was not

sufficiently rebutted. We note that it is virtually always improper for witnesses, *particularly police witnesses,* to go to lunch with a juror during the middle of a trial. As this misconduct was left uncorrected, petitioner did not receive an impartial jury trial as mandated by the United States Constitution and the Maryland Declaration of Rights. Accordingly, we reverse the decision of the Court of Special Appeals.[38]

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AND TO REMAND THE CASE TO THE CIRCUIT COURT FOR A NEW TRIAL; COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY MONTGOMERY COUNTY.**

Judge ELDRIDGE and Judge RAKER join in the result only.

---

**38.** The circumstances here were particularly egregious. We reiterate that the holding here does not necessarily apply to purely incidental contact.